IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TERRY DORSEY, #193579,    \*

  Plaintiff,      \*

v.           \*     Civil Action No. GLR-18-3304

WEXFORD HEALTH SOURCES INC., \*
et al.,
            \*

  Defendants.

         \*\*\*\*\*

## <u>MEMORANDUM OPINION</u>

THIS MATTER is before the Court on Defendants Wexford Health Sources, Inc. ("Wexford"), Brenda Reese, R.N., Mahboob Ashraf, M.D., Holly Pierce, N.P., and B. Cohen's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 12); and Plaintiff Terry Dorsey's Opposition to Defendants Motion to Dismiss and Alternatively Plaintiff's Cross Motion for Partial Summary Judgment ("Cross Motion for Partial Summary Judgment") (ECF No. 22) and Request for Emergency Temporary Restraining Order ("TRO Motion") (ECF No. 26).[1] The Motions are ripe for disposition, and no hearing is necessary. See Local Rule 105.6. (D.Md. 2018). For the reasons outlined below, the Court will grant Defendants' Motion and deny Dorsey's Motions.

---

[1] Also pending before the Court is correspondence from Dorsey (ECF No. 24) that the Court construes as a Motion for Reconsideration. On May 28, 2019, the Court granted Defendants' Motion as unopposed and closed the case. (May 28, 2019 Order, ECF No. 21). However, after receiving Dorsey's Opposition, which was timely under the prison mailbox rule, the Court vacated its May 28, 2019 Order and re-opened the case on May 31, 2019. (May 31, 2019 Order, ECF No. 23). Because the case has already been reopened, the Court will deny Dorsey's Motion for Reconsideration as moot.

# I.    BACKGROUND[2]

Dorsey is a state prison inmate housed at the North Branch Correctional Institution ("NBCI") in Cumberland, Maryland. (Compl. at 2, ECF No. 1; Dorsey Decl. ¶ 2).[3] Dorsey's medical history includes Pityriasis versicolor,[4] hypertension, constipation, backache, asthma, and hearing impairment, and a mental health history of personality disorder. (See Dr. Getachew Aff. ¶ 4, ECF No. 12-5; Defs.' Mot. Dismiss Altern. Mot. Summ. J. Ex. 4 ["Medical Records"] at 3, ECF No. 12-4).[5]

In February 1996, an Ear, Nose, and Throat ("ENT") specialist diagnosed Dorsey with deafness in his left ear. (Suppl. at 6, ECF No. 5, Dorsey Decl. ¶ 3).[6] Dorsey alleges that on August 10, 2016 it was determined that he needed a hearing aid. (Suppl. at 6). Dr. Ross Cushing, an audiologist, saw Dorsey on November 16, 2016 and noted that Dorsey was completely deaf in the left ear and had profound hearing loss in the right ear. (Medical Records at 2; Dorsey Decl. ¶ 4). According to Dr. Cushing, the left ear was unaidable, but he recommended a hearing aid for the right ear. (Medical Records at 2; Dorsey Decl. ¶ 4).

---

[2] Unless otherwise noted, the facts outlined here are set forth in Dorsey's Complaint (ECF No. 1) and Supplement (ECF No. 5). To the extent the Court discusses facts that Dorsey does not allege in his Complaint, they are uncontroverted and the Court views them in the light most favorable to the non-moving party. The Court will address additional facts when discussing applicable law.

[3] Citations to the Complaint refer to the pagination the Court's Case Management and Electronic Case Files ("CM/ECF") system assigned.

[4] Pityriasis versicolor, also known as Tinea versicolor, is a fungal infection caused by a type of yeast that naturally lives on the skin but can grow out of control, manifesting as a rash. See Tinea Versicolor: Cause, Symptoms, and Treatments, WEBMD, https://www.webmd.com/skin-problems-and-treatments/tinea-versicolor-cause-symptoms-treatments#1 (last visited Aug. 14, 2019).

[5] Citations to Dorsey's Medical Records refer to the CM/ECF pagination.

[6] Citations to the Supplement refer to the CM/ECF pagination.

On January 3, 2017, Dr. Cushing or Nurse Krista Bilak updated Dorsey's chart to note that a hearing aid was requested. (Medical Records at 3; Dorsey Decl. ¶ 5). On January 25, 2017, Dorsey returned to Dr. Cushing for a hearing aid fitting. (Medical Records at 4; Dorsey Decl. ¶ 6). Dr. Cushing advised Dorsey that the battery needed to be taken out of the hearing aid every night and should last approximately six to ten days, depending on the amount of time the aid is used. (Medical Records at 4). At that time, Dorsey "requested to be transferred to Disability Tier" and to have the words "Hearing Loss" placed on his badge. (Medical Records at 4; Dorsey Decl. ¶ 7).

On February 1, 2017, Nurse James Hunt saw Dorsey during segregation rounds, at which time Dorsey asked to be transferred to a different correctional institution with facilities for the hearing-impaired. (Medical Records at 5). Hunt directed Dorsey to submit a sick call slip regarding his request. (Id.). Hunt noted that Dorsey was able to hear and answer questions through the cell door using normal speaking volume and that Dorsey's cell door had a special designation indicating a hearing-impaired inmate. (Id.).

On March 6, 2017, Dorsey was scheduled to discuss his audiology visit with medical personnel, but he refused to attend. (Id. at 6). On March 8, 2017, Dorsey was scheduled for a visit to the chronic care clinic to discuss his hearing loss but again refused to attend. (Id. at 7). That same day, however, Dorsey submitted a sick call slip to see a provider regarding his hearing loss. (Id. at 8). Although he was scheduled to see medical personnel on March 9, 2017 to address his concerns, Dorsey refused to see the nurse during the scheduled appointment. (Id. at 9).

On March 11, 2017, Dorsey submitted another sick call slip regarding his hearing loss. (Id. at 10). On March 14, 2017, Hunt saw Dorsey during segregation rounds, at which time he inquired about seeing a provider for hearing loss. (Id. at 11). Hunt reminded Dorsey that he recently refused two appointments for that purpose and noted that a letter would be sent to him reiterating the need to show up for appointments. (Id.). Later that day, Bilak saw Dorsey to discuss his hearing loss. (Id. at 12). Dorsey requested transfer to another institution as well as access to TTY facilities, but Bilak informed him that the medical staff could not address his concerns and that he would have to raise them with the correctional staff. (Id.). Dorsey stated that he had four inoperable hearing aid batteries, so Bilak placed an order to provide Dorsey with two batteries per week. (Id.). She informed him that the required batteries were not in stock but would be "delivered Thursday." (Id.). On March 16, 2017, Bilak provided Dorsey with two hearing aid batteries. (Id. at 14).

On March 27, 2017, Dorsey submitted a sick call slip complaining that his medications had not been renewed. (Id. at 15). Dorsey alleges that on March 28, 2017, he requested the ENT specialist's records and notes regarding his hearing loss and the need for a hearing aid, but "medical records personnel B. Cohen" told him that there were no such records. (Suppl. at 6–7; Dorsey Decl. ¶ 8; Dorsey Decl. Ex. 1). On March 30, 2017, a nurse saw Dorsey and noted that Dorsey's Vitamin E lotion did not expire until April 6,

2017, that he did not have a current prescription for alcohol rub, and that his clindamycin[7] was reordered. (Medical Records at 15).

On May 5, 2017, Dorsey submitted sick call slips requesting to renew his medications and to be taken off the 2400-calorie diet, but he refused to attend the appointment to review his requests. (Id. at 16–18). Nonetheless, Dorsey's medications were noted as current through July 2, 2017. (Id. at 16). On May 10, 2017, Dorsey submitted another sick call slip asking to be taken off the 2400-calorie diet, a request that the medical staff reviewed on May 12, 2019. (Id. at 20).

On July 19, 2017, Dorsey submitted a sick call slip complaining that his Neurontin and Baclofen prescriptions for nerve pain had expired two weeks earlier. (Id. at 21). On July 24, 2017, he submitted two sick call slips complaining about dry skin as well as pain and numbness in his left leg. (Id. at 22–23). On July 28, 2017, Bilak[8] noted that Dorsey's prescription for Baclofen had been renewed through September 29, 2017, and his Neurontin prescription had been renewed through November 28, 2017. (Id. at 24).

On October 10, 2017, Dorsey was scheduled to see Dr. Ashraf at the chronic care clinic, but Dorsey did not attend. (Id. at 27). On October 12, 2017, Dorsey submitted a sick call request to see a provider to renew his medications. (Id. at 29). He alleges that he did not attend the appointment with Dr. Ashraf because a correctional officer refused to take

---

[7] Clindamycin is an antibiotic that fights infections caused by bacteria in the body. See Clindamycin, DRUGS.COM, https://www.drugs.com/clindamycin.html (last visited Aug. 14, 2019).

[8] By the time of that appointment, Krista Bilak's name had changed to Krista Self. (See Medical Records at 24; Mem. Supp. Defs.' Mot. Dismiss Altern. Mot. Summ. J. at 5 n.4, ECF No. 12-3). To avoid confusion, the Court will continue to refer to her as Bilak.

him. (Id.). On October 15, 2017, Nurse Pierce saw Dorsey and noted that he requested Neurontin and Baclofen. (Id. at 30). Dorsey was in no acute distress, his backache was assessed as stable, and his exam was otherwise unremarkable. (Id.). When asked to discuss his inhaler and blood pressure medication, Dorsey "seemed confused and unable to answer," so Pierce educated Dorsey on medication compliance. (Id.).

On October 24, 2017, Dorsey submitted a sick call slip to renew unspecified medications. (Id. at 32). On October 30, 2017, Bilak saw Dorsey at the chronic care clinic, noting that his blood pressure and asthma were stable and that his exam was unremarkable. (Id. at 33). Dorsey was in no apparent distress, and his chart indicated that his Neurontin prescription would continue through November 28, 2017. (Id. at 34–35).

Dorsey alleges that he requested use of the TTY system[9] and that Defendants told him "that was a custody staff issue." (Dorsey Decl. ¶ 9). On October 30, 2017, he wrote to custody staff about the issue. (Id.). On November 2, 2017, Case Manager Ms. S. Johnson MS II responded to Dorsey, stating that the medical department must "sign off" on TTY access but had informed her that Dorsey "ha[s] a hearing aid but [is] not deaf." (Dorsey Decl. ¶ 9; Dorsey Decl. Ex. 2). That same day, Dorsey requested access to the TTY system

---

[9] People who are deaf, hard of hearing, or have difficulty speaking can use a TTY (also known as a text telephone) to make and receive calls through Maryland Relay. See TTY (Text Telephone), MARYLAND RELAY, https://doit.maryland.gov/mdrelay/Pages/TTY.aspx (last visited Aug. 5, 2019). A TTY has a keyboard, which allows the user to type his side of the conversation, and a text screen to read the other person's responses. Id.

from Acting Medical Director Nurse Reese but received no response. (Dorsey Decl. ¶ 12; Dorsey Decl. Ex. 4).

On November 21, 2017, Dorsey submitted a sick call slip seeking renewal of unspecified medications and complaining of numbness in his left hip, leg, and foot. (Medical Records at 36). Dr. Ashraf saw Dorsey regarding those concerns on November 28, 2017 and prescribed a tapering dose of Neurontin scheduled to stop on December 28, 2017. (Id. at 37–39). Dorsey alleges that his prescription for the pain medication Neurontin expired on November 25, 2017 and that Dr. Ashraf did not order substitute medication. (Suppl. at 7). Dorsey states that Dr. Ashraf also tapered off his prescription for the pain medication Baclofen but did not prescribe a substitute. (Id.).

On December 12, 2017, Dorsey wrote Reese about his untreated pain and received no response. (Dorsey Decl. ¶ 12; Dorsey Decl. Ex. 4). On December 16, 2017, Dorsey submitted a sick call slip complaining that his Neurontin had not been renewed. (Medical Records at 40). On December 18, 2017, Nurse Tammy Buser saw Dorsey for his complaint of back pain. (Id. at 41). Buser noted that Dorsey was able to walk well and had no difficulty getting up on the table. (Id.). In addition, Dorsey had no swelling, strong pedal pulses, no apparent pain with movement, and a range of motion was within normal limits. (Id.). Dorsey asked for an increase in Neurontin, but Buser instructed him to follow up after trying exercises to alleviate his pain. (Id.).

On January 3, 2018, Dorsey submitted a sick call slip complaining of back pain shooting down to his feet. (Id. at 44). When summoned to nurse sick call for this complaint, Dorsey refused to come, according to correctional custody staff. (Id. at 45). On January 28,

2018, Dr. Ashraf saw Dorsey at the chronic care clinic. (Id. at 46). At that time, Dorsey's asthma and hypertension were stable, he was in no apparent distress, and his exam was unremarkable. (Id.). Dorsey requested to be placed on the 2400-calorie diet, and he was prescribed Tegretol[10] for pain. (Id. at 46–48).

Dorsey alleges that, beginning in February 2018, he was informed that he would have to fill out a sick call request in order to receive batteries for his hearing aid. (Suppl. at 6). Dorsey alleges that he made two or more sick call requests but was not receiving the batteries. (Id.). On May 22, 2018, Dorsey submitted sick call slips requesting the renewal of unspecified medications as well as hearing aid batteries. (Medical Records at 49–50). On May 25, 2018, Buser saw him at sick call, at which time his batteries were replaced. (Id. at 51). Yet Dorsey alleges that he has not received hearing-aid batteries since January 2018. (Dorsey Decl. ¶ 14).

On June 3, 2018, Dorsey submitted sick call slips seeking renewal of unspecified medications and complaining of back pain. (Medical Records at 53–54). On June 5, 2018, he submitted additional sick call slips requesting hearing aid batteries and complaining that unspecified medications had stopped. (Id. at 55–56; Dorsey Decl. ¶ 12). On June 8, 2018, Buser saw Dorsey at sick call and noted that Dorsey had a steady gait, his vital signs were stable, he was alert and oriented, he could walk well, and was able to bend over without difficulty. (Medical Records at 57). Nonetheless, Buser referred Dorsey to a medical

---

[10] Tegretol (carbamazepine) is "an anticonvulsant used to treat seizures and nerve pain such as trigeminal neuralgia and diabetic neuropathy." See John P. Cunha, Tegretol Side Effects Center, RXLIST, https://www.rxlist.com/tegretol-side-effects-drug-center.htm (last visited Aug. 14, 2019).

provider regarding his request for pain medication. (Id.). During that visit, Dorsey refused hearing aid batteries, stating that he had "just received them." (Id.). Both that day and the following day, Dorsey submitted sick call slips complaining of nerve pain. (Id. at 59–60).

Dorsey states that around June 28, 2018, he requested batteries from Nurse Pierce, who told him that he had not placed an order for batteries. (Suppl. at 8). Dorsey alleges that Pierce said she would investigate but failed to contact him thereafter. (Id.). Dorsey also states that he contacted Reese about these problems but that she never addressed them. (Id. at 7–8).

On June 30, 2018, Dorsey submitted a sick call slip complaining of "numerous medical issues," to have his asthma inhaler and pain medication renewed, and to obtain hearing aid batteries. (Id. at 61). It was noted that Dorsey's Albuterol,[11] Amlodipine,[12] and Tegretol had expired on May 28, 2018. (Id.).

On July 2, 2018, Nurse Regina Lease saw Dorsey at sick call regarding his requests for medication renewal. (Id. at 63). Lease contacted a medical provider who renewed Dorsey's prescriptions for Norvasc, Tegretol, and Ventolin and Proair inhalers through November 2, 2018. (Id. at 63). On July 11, 2018, Pierce saw Dorsey at the chronic care

---

[11] Albuterol is a medication administered via inhaler that is prescribed "to prevent and treat wheezing and shortness of breath caused by breathing problems," such as asthma. See Albuterol Sufate 90 Mcg/Actuation Breath Activated Powder Inhaler, WEBMD, https://www.webmd.com/drugs/2/drug-4872-1697/albuterol-sulfate-inhalation/albuterol-salbutamol-breath-activated-inhaler-oral-inhalation/details (last visited Aug. 14, 2019).

[12] "Norvasc (amlodipine) is a calcium channel blocker that dilates (widens) blood vessels and improves blood flow [and] . . . is used to treat high blood pressure (hypertension)." See Norvasc, DRUGS.COM, https://www.drugs.com/norvasc.html (last visited Aug. 14, 2019).

clinic, at which time Dorsey's asthma and hypertension were stable, he was in no apparent distress, and his exam was otherwise unremarkable. (Id. at 65).

On August 16, 2018, Nurse Michael Klepitch saw Dorsey at sick call and he renewed his request to be taken off the 2400-calorie diet. (Id. at 68). On August 28, 2018, Dr. Getachew saw Dorsey via medical teleconference. (Id. at 70). Dr. Getachew noted that Dorsey's hypertension and asthma were well-controlled. (Id.). Dorsey complained of back pain and stated that Tegretol made him drowsy, requesting Neurontin instead. (Id.). Dr. Getachew informed Dorsey that Neurontin is not a drug of choice for back pain and told him that exercises would help the pain. (Id.). Dorsey then complained that he was still getting a 2400-calorie diet, prompting Dr. Getachew to send a message to the dietary secretary. (Id.).

According to Dr. Getachew, Dorsey continues to have regular access to health care providers through the chronic care clinic and to more immediate medical care though the sick call process. (Dr. Getachew Aff. ¶ 16).

On October 25, 2018, Dorsey sued Reese, Dr. Ashraf, Pierce, Cohen, and Wexford. (ECF No. 1). On November 11, 2018, the Court granted Dorsey twenty-eight days to supplement his Complaint. (Nov. 11, 2018 Order, ECF No. 3). On December 3, 2018, Dorsey filed a Supplement to the Complaint. (ECF No. 5). In the Supplement, he asserts claims against Defendants for deliberate indifference and cruel and unusual punishment in violation of the Eighth Amendment to the U.S. Constitution under 42 U.S.C. § 1983

(2018)[13]; and violation of Section 504 of the Rehabilitation Act of 1973. (Suppl. 6–8). He seeks compensatory and punitive damages totaling $120,000, as well as injunctive relief. (Id. at 8).

On January 10, 2019, Defendants filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. (ECF No. 12). On May 28, 2019, Dorsey filed his Opposition and Cross-Motion for Partial Summary Judgment. (ECF No. 22). On June 12, 2019, Defendants filed a Reply and Opposition to Dorsey's Cross-Motion. (ECF No. 25). On July 11, 2019, Dorsey filed a Reply. (ECF No. 27).

On July 9, 2019, Dorsey filed his TRO Motion. (ECF No. 26). On July 17, 2019, Defendants filed an Opposition. (ECF No. 29). On August 12, 2019, Dorsey filed a Reply. (ECF No. 30).[14]

---

[13] Specifically, Dorsey asserts that: Defendants' failure to inform correctional officers of his hearing impairment amounted to deliberate indifference to a serious medical need, (Suppl. at 7); that Defendants' denial of his request for the TTY system amounted to deliberate indifference, (id. at 7); that Dr. Ashraf subjected him to cruel and unusual punishment by failing to order substitute medication when Dorsey's Neurontin and Baclofen prescriptions expired, (id. at 7); that Defendants failed to give him adequate medical care because he made multiple sick call requests but did not receive his hearing aid batteries, (id. at 6); and that Pierce and Reese violated his Eighth Amendment rights by not responding to Dorsey's complaints and requests, (id. at 8).

Dorsey's assertion of new claims in his briefs—e.g., that Defendants breached an agreement to provide medical care to prisoners, (Mem. L. Supp. Opp'n Cross-Mot. Part. Summ. J. at 1, ECF No. 22)—fails because a plaintiff cannot bring new claims through motions briefs. Hurst v. D.C., 681 F.App'x 186, 194 (4th Cir. 2017) (noting that "a plaintiff may not amend her complaint via briefing").

[14] On July 16, 2019, Defendants filed a Motion to Strike Surreply (ECF No. 28). They contend that Dorsey's "Plaintiff's Declaration and Motion in Opposition to Defendants Response in Opposition to Plaintiff's Motion of Opposition to Defendants Motion to Dismiss or in the Alternative Motion for Summary Judgment - Plaintiff Also Request for Partial Summary Judgment," (ECF No. 27), is an impermissible surreply that should be stricken pursuant to Local Rule 105.2 (D.Md. 2018). Dorsey's filing is difficult

## II.    DISCUSSION

**A.    <u>Defendants' Motion</u>**

**1.    Conversion**

Defendants' Motion is styled as a motion to dismiss under Rule 12(b)(6) or, in the alternative, for summary judgment under Rule 56. Motions styled in this manner implicate the Court's discretion under Rule 12(d). <u>See</u> <u>Kensington Vol. Fire Dep't., Inc. v. Montgomery Cty.</u>, 788 F.Supp.2d 431, 436–37 (D. Md. 2011), <u>aff'd</u>, 684 F.3d 462 (4th Cir. 2012). This Rule provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). The Court "has 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'" <u>Wells-Bey v. Kopp</u>, No. ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013) (quoting 5C Wright & Miller, <u>Federal Practice & Procedure</u> § 1366, at 159 (3d ed. 2004, 2012 Supp.)).

The United States Court of Appeals for the Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice and a reasonable opportunity for discovery. <u>See</u> <u>Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council</u>, 721 F.3d 264, 281 (4th Cir. 2013). When the movant

---

to parse, but given that he is a pro se prisoner, the Court will construe it as a Reply to Defendants' Opposition to Dorsey's Cross-Motion for Partial Summary Judgment. Accordingly, the Court will deny Defendants' Motion.

expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. See Moret v. Harvey, 381 F.Supp.2d 458, 464 (D.Md. 2005). The Court "does not have an obligation to notify parties of the obvious." Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 261 (4th Cir. 1998).

Ordinarily, summary judgment is inappropriate when "the parties have not had an opportunity for reasonable discovery." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011). Yet, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)). To raise the issue that more discovery is needed, the non-movant must typically file an affidavit or declaration, explaining the "specified reasons" why "it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d).

Here, the Court concludes that both requirements for conversion are satisfied. Dorsey was on notice that the Court might resolve Defendants' Motion under Rule 56 because Defendants styled their Motion in the alternative for summary judgment and presented extra-pleading material for the Court's consideration. See Moret, 381 F.Supp.2d at 464. In addition, the Clerk informed Dorsey about the Motion and the allotted time to file an opposition. (Jan. 11, 2019 Ltr., ECF No. 13). Dorsey filed an Opposition that included materials in support of his claims but did not include a request for more time to

conduct further discovery. Because the Court will consider documents outside of Dorsey's Complaint in resolving Defendants' Motion, the Court will treat the Motion as one for summary judgment.

## 2.    Standard of Review

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation

or the building of one inference upon another." <u>Othentec Ltd. v. Phelan</u>, 526 F.3d 135, 141 (4th Cir. 2008) (quoting <u>Beale v. Hardy</u>, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. <u>Anderson</u>, 477 U.S. at 248; <u>see also</u> <u>JKC Holding Co. v. Wash. Sports Ventures, Inc.</u>, 264 F.3d 459, 465 (4th Cir. 2001) (citing <u>Hooven-Lewis v. Caldera</u>, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248; <u>accord</u> <u>Hooven-Lewis</u>, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. <u>Anderson</u>, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23 (1986).

When the parties have filed cross-motions for summary judgment, the court must "review each motion separately on its own merits to 'determine whether either of the parties deserves judgment as a matter of law.'" <u>Rossignol v. Voorhaar</u>, 316 F.3d 516, 523 (4th Cir. 2003) (quoting <u>Philip Morris Inc. v. Harshbarger</u>, 122 F.3d 58, 62 n.4 (1st Cir. 1997)). Moreover, "[w]hen considering each individual motion, the court must take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion." <u>Id.</u> (quoting <u>Wightman v. Springfield</u>

Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996)). The Court, however, must also abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to trial. Drewitt v. Pratt, 999 F.2d 774, 778–79 (4th Cir. 1993). If the evidence presented by the nonmovant is merely colorable, or is not significantly probative, summary judgment must be granted. Anderson, 477 U.S. at 249–50.

**3.      Analysis**

**a.      Eight Amendment Claims**

With respect to summary judgment, Defendants argue that there is no evidence that Defendants were deliberately indifferent to Dorsey's medical needs such that he could prove his Eighth Amendment claim. Dorsey counters that there are genuine disputes of material fact as to whether Defendants violated his constitutional rights. The Court agrees with Defendants.

To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. Estelle v. Gamble, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that: (1) objectively, the prisoner was suffering from a serious medical need; and (2) that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available. See Farmer v. Brennan, 511 U.S. 825, 837 (1994); Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008).

Under the objective prong, a serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person

would easily recognize the necessity for a doctor's attention." <u>Iko</u>, 535 F.3d at 241 (quoting <u>Henderson v. Sheahan</u>, 196 F.3d 839, 846 (7th Cir. 1999)). The subjective component requires "subjective recklessness" in the face of the serious medical condition. <u>See</u> <u>Farmer</u>, 511 U.S. at 839–40. "True subjective recklessness requires knowledge both of the general risk, and also that the [defendant's] conduct is inappropriate in light of that risk." <u>Rich v. Bruce</u>, 129 F.3d 336, 340 n.2 (4th Cir. 1997). "[I]t is not enough that an official <u>should</u> have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." <u>Jackson v. Lightsey</u>, 775 F.3d 170, 178 (4th Cir. 2014) (first citing <u>Farmer</u>, 511 U.S. at 837–39; and then citing <u>Iko</u>, 535 F.3d at 241). If the requisite subjective knowledge is established, an official may still avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." <u>Farmer</u>, 511 U.S. at 844. "[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." <u>Jackson</u>, 775 F.3d at 178. Thus, "[d]eliberate indifference is 'more than mere negligence,' but 'less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result.'" <u>Scinto v. Stansberry</u>, 841 F.3d 219, 225 (4th Cir. 2016) (citing <u>Farmer</u>, 511 U.S. at 844).

Under this standard, a mere disagreement between an inmate and a physician over the appropriate level of care does not establish an Eighth Amendment violation absent exceptional circumstances. <u>Id.</u> Further, the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical

necessity and not simply that which may be considered merely desirable." Bowring v. Godwin, 551 F.2d 44, 47–48 (4th Cir. 1977).

The substantial medical records produced in this case[15] rebut certain of Dorsey's claims. They show that Defendants have acknowledged Dorsey's hearing loss and have marked his cell to indicate that he is a hearing-impaired inmate, thereby alerting correctional officers, staff, and other prisoners about his condition. The records also show, contrary to Dorsey's allegations and declarations, that he has received replacement hearing aid batteries several times, including through the sick call process and after January 2018.

Dorsey's TTY claim does not meet either the objective or subjective prong of the Farmer test. Even if Dorsey's partial deafness qualifies as a serious medical condition, Defendants have addressed that condition with the hearing aid. With his hearing aid, Dorsey admits, and the medical records confirm, that he can hear, even if he has some problems hearing through a telephone. Defendants are not required to ensure that Dorsey's partial deafness is completely cured at all times and in all situations. Bowring, 551 F.2d at 47–48. With respect to the subjective prong, Defendants have informed Dorsey that correctional staff, not Defendants, are responsible for providing the TTY system, and have otherwise noted that he can hear with his hearing aid so TTY is not necessary. Therefore, to the extent Dorsey's use of the TTY system is within Defendants' authority, they have considered his request and either denied it as unnecessary or deferred to the appropriate

---

[15] To the extent Dorsey brings a claim against B. Cohen for failure to produce certain medical records in March 2017, that claim fails. Dorsey concedes that he has since received those records. (Dorsey Decl. ¶ 8).

decisionmaker. Accordingly, the Court concludes there was no "excessive risk," Jackson, 775 F.3d at 178, and that Defendants' response to Dorsey's request does not amount to "subjective recklessness," Farmer, 511 U.S. at 839–40.

Further, when Dr. Ashraf discontinued Dorsey's prescriptions for Neurontin and Baclofen in 2017, the medical records show Dr. Ashraf prescribed Tegretol for pain through November 2018. This was Dr. Ashraf's prerogative, and Dorsey does not present exceptional circumstances to persuade the Court otherwise. Scinto, 841 F.3d at 225; Bowring, 551 F.2d at 47–48.

Even if Dorsey's nerve pain, hearing impairment, or other ailments were sufficiently severe so as to constitute a serious medical need for Eighth Amendment purposes, the record does not support a finding that Defendants acted with deliberate indifference to those needs. From his diagnosis of hearing loss on November 16, 2016 until his teleconference visit with Dr. Getachew on August 16, 2018, Defendants and other medical staff saw Dorsey at least twenty times for scheduled appointments and sick call visits, during which time they noted his complaints, provided hearing aid batteries upon request, evaluated his diet, assessed the need for and re-prescribed medication, and monitored his overall health in various ways. In addition, Dorsey was scheduled for at least six sick call visits that he refused to attend. Other disputed facts, such as exactly when Defendants transitioned his medications or when he received another set of hearing aid batteries, are not material. The undisputed medical records clearly show that Defendants responded to Dorsey's various issues and needs over the period of years in question on a reasonable schedule. Bowring, 551 F.2d at 47–48. On these facts, viewed most favorably to Dorsey,

he cannot demonstrate Defendants showed callous disregard for his serious medical need. See Estelle, 429 U.S. at 105–06. The Court will, therefore, grant Defendants' Motion with respect to Dorsey's Eighth Amendment claims.

## B.  **Rehabilitation Act Claim**

In the last sentence of his Supplement's "Statement of Claim" section, Dorsey summarily states that "defendants have consistently violated Section 504 of the Rehabilitation Act of 1973." (Suppl. at 8). Defendants do not reference this claim in their Motion, and Dorsey never mentions that statute again. Because Dorsey fails to allege facts that would support his claim, the Court will dismiss it without prejudice.

Dorsey filed his Complaint in forma pauperis pursuant to 28 U.S.C. § 1915(a)(1) (2018), which permits an indigent litigant to commence an action in this Court without prepaying the filing fee. To guard against possible abuses of this privilege, the statute requires dismissal of any claim that "fails to state a claim on which relief may be granted." § 1915(e)(2)(B)(ii).

A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S.

at 555). Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. Goss v. Bank of America, N.A., 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012)), aff'd sub nom. Goss v. Bank of America, NA, 546 F.App'x 165 (4th Cir. 2013). The Court is mindful, however, of its obligation to construe liberally self-represented pleadings, see Erickson v. Pardus, 551 U.S. 89, 94 (2007), and assume the factual allegations are true. Id. at 93 (citing Twombly, 550 U.S. at 555–56). Nonetheless, liberal construction does not mean that the Court can ignore a clear failure in the pleading to allege facts which set forth a cognizable claim. See Weller v. Dep't of Soc. Servs., 901 F.2d 387 (4th Cir. 1990); see also Beaudett v. City of Hampton, 775 F.2d 1274, 1278 (4th Cir. 1985) (stating a district court may not "conjure up questions never squarely presented").

To establish a prima facie case under Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 et seq. (2018), or the Rehabilitation Act, 19 U.S.C. §§ 701 et seq. (2018), the plaintiff must show that: (1) he has a disability; (2) he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities for which he was otherwise qualified; and (3) the exclusion, denial of benefits, or discrimination was by reason of the disability. See Nat'l Fed'n of the Blind v. Lamone, 813 F.3d 494, 502–03 (4th Cir. 2016) (citing Constantine v. George Mason Univ., 411 F.3d 474, 498 (4th Cir. 2005)); Baird, 192 F.3d at 467 (citing Doe v. Univ. of Md. Med. Sys. Corp., 50 F.3d 1261, 1265 (4th Cir. 1995)). Under the Rehabilitation Act, a plaintiff must establish that he was excluded solely by reason of his disability, while the

ADA requires only that the disability was a motivating cause of the exclusion. <u>Halpern v. Wake Forest Univ. Health Scis.</u>, 669 F.3d 454, 461–62 (4th Cir. 2012) (citing <u>Baird</u>, 192 F.3d at 468-69).

Here, Dorsey does not specify which of his allegations support his Rehabilitation Act claim, that is, what his qualifying disability is or what "services, programs, or activities" for which he was qualified but from which he was excluded.[16] But even construing his pleadings liberally based on his pro se prisoner status, and inferring that his Rehabilitation Act claim concerns his hearing impairment and the denial of hearing aid batteries at some time or access to the TTY system at another, Dorsey does not allege that Defendants denied him those hearing-related services solely because of his disability. Dorsey does not plead discrimination on any basis. In fact, Defendants have acknowledged Dorsey's hearing loss, marked his cell appropriately, and given him many sets of hearing aid batteries over the course of several months. With respect to the TTY system, Defendants have informed Dorsey that correctional staff are responsible for providing it. His case manager's denial of access to the TTY system was based on consultation with medical staff who told her that Dorsey was able to hear with his hearing aid. In short, Defendants have generally attended to Dorsey's needs; they have not singled him out for

---

[16] To the extent Dorsey alleges that a denial of medical treatment violates his rights under the Rehabilitation Act, that claim fails as well. Although the Fourth Circuit has not addressed this issue in a published opinion, unpublished cases from this circuit and published and unpublished cases from other circuits indicate that a prisoner may not state a claim under the ADA or Rehabilitation Act for a lack of medical treatment. <u>See</u> <u>Stewart v. Joubert</u>, No. JFM-11-427, 2012 WL 294910, at *9 (D.Md. Jan. 31, 2012) (collecting cases), <u>aff'd</u>, 474 F.App'x 238 (4th Cir. 2012).

exclusion. Because he does not allege denial of services solely because of a disability, the Court will dismiss this claim without prejudice. See Jardina v. Dep't of Pub. Safety & Corr. Servs., No. JKB-16-1255, 2017 WL 839526, at *9 (D.Md. Mar. 3, 2017) (citing Spencer v. Easter, 109 F.App'x 571, 573 (4th Cir. 2004) ("Because there is no evidence in the record to suggest that any failure by the Defendants . . . stemmed from any discriminatory intent due to any alleged disability, we find that he fails to establish a prima facie claim under the ADA."), appeal dismissed and remanded, 696 F. App'x 130 (4th Cir. 2017).

## C.   **Dorsey's Motions**

For the same reasons the Court will grant summary judgment in Defendants' favor on Dorsey's Eighth Amendment claims and dismiss his Rehabilitation Act claim, the Court will deny Dorsey's Cross Motion for Partial Summary Judgment.

To the extent Dorsey's TRO Motion seeks relief for the same claims set out in his Complaint and Supplement, the Court will deny the Motion. See Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008) (requiring plaintiff to show, along with three other factors, a likelihood of success on the merits). To the extent Dorsey's TRO Motion seeks relief for other claims—e.g., an injunction requiring his transfer to another correctional institution, (Mot. TRO at 5)—the Court will also deny the Motion. See Omega World Travel, Inc. v. Trans World Airlines, 111 F.3d 14, 16 (4th Cir. 1997) (noting that interim equitable relief can only be granted to protect the movant from harm stemming from "the illegality alleged in the complaint").

### III.   CONCLUSION

For the foregoing reasons, the Court will grant Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 21). The Court will deny Dorsey's Motion for Reconsideration (ECF No. 24), Motion for Temporary Restraining Order (ECF No. 26), and Motion in Opposition to Defendants' Response or, in the Alternative, Motion for Summary Judgment (ECF No. 27). The Court will also deny Defendants' Motion to Strike Surreply (ECF No. 28). A separate Order follows.

Entered this 19th day of August, 2019.

_____/s/_____
George L. Russell, III
United States District Judge
